Theodore **ROTHSTEIN**,
Plaintiff–Appellee,

v.

Mark **CARRIERE**, Defendant–
Appellant,

and

**Multi–Media Distributing Co. Inc., Leisure Time Entertainment, Inc., and Leisure Time Products, Inc.,** Defendants.

**Docket No. 02–7731.**

United States Court of Appeals,
Second Circuit.

Argued: Feb. 6, 2003.

Decided: June 24, 2004.

Randy M. Friedberg, Olshan, Grundman, Frome, Rosenzweig & Wolosky LLP, New York, N.Y. (Thomas J. Fleming, on the brief, Arthur M. Schwartz, Cindy Schwartz, Schwartz & Goldberg P.C., Denver, CO, on the brief) for Defendant–Appellant Mark Carriere.

Elkan Abramowitz, and Noah D. Genel, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York, N.Y. (Robert F. Katzberg, Kaplan & Katzberg, New York, NY, on the brief), for Plaintiff–Appellee Theodore Rothstein.

Before: WALKER, Chief Judge, POOLER, Circuit Judge, and GLEESON, District Judge.[1]

GLEESON, United States District Judge.

In the early 1990s, Mark Carriere and Theodore Rothstein were both engaged in the pornography business. Both were also under investigation by the federal government. In 1994, after Carriere was indicted on obscenity charges, he agreed to cooperate with the government's ongoing investigation of Rothstein. On March 18, 1994, as part of that cooperation, Carriere told the government that Rothstein controlled a company in Brooklyn, New York that produced and distributed obscene videos.

In February 1996, Rothstein was indicted on obscenity charges in the Northern District of Florida. The government dismissed the charges in 1997. Rothstein then brought this action against Carriere in the United States District Court for the Eastern District of New York, alleging that Carriere lied about him to the government. A jury found that Carriere was liable for malicious prosecution. It awarded Rothstein $1,000,000 in punitive damages and compensatory damages in an amount that was subsequently adjusted by the district court to $128,078.19.

We reverse and remand with instructions to enter judgment for Carriere.

## FACTS

### A. The Investigation of Bizarre Video

Sometime prior to October 1990, Jimmy Whitaker, a Special Agent with the Federal Bureau of Investigation ("FBI"), entered a video store in Tallahassee, Florida. Whitaker was conducting an investigation into possible violations of the federal obscenity laws. During the search, Whitaker discovered a collection of obscene videos that had been shipped to the store by Multi–Media Distributing Co., Inc. ("Multi–Media"), Carriere's Indiana company. As a result of the seizure of those videos, and after some further investigation, a search warrant was executed in October 1990 at Multi–Media's Indiana offices. Among other things, $548,000 in cash was seized from a safe.

After that search, Special Agent Matthew Pellegrino, who had taken over responsibility for the investigation from Agent Whitaker, received (in an undercover capacity) a catalogue from a Multi–Media–related company that offered obscene videos for sale. The catalogue stated that the videos were distributed by Bizarre Video. These events led to a second search of Multi–Media's offices, in July 1991. This search revealed, among other things, that Carriere was doing business with a New York company named Bizarre Video/Bean Blossom ("Bizarre"). Specifically, labels and invoices seized during the searches revealed that Bizarre had supplied obscene videos to Carriere and Multi–Media. On some of the invoices, the preprinted name "Star" had been crossed out, and the name "Bizarre" was written by hand. The investigators then turned their attention to identifying the owners and principals of Bizarre.

Rothstein was the owner of Star Distributors ("Star"), a pornography business located at 20–40 Jay Street, Brooklyn, New York. Star's offices were on the same floor of the same building as the offices of Bizarre, and both companies used the same space to store videos and shipping labels.

---

**1.** The Honorable John Gleeson of the United States District Court for the Eastern District of New York, sitting by designation.

On July 23, 1992, the investigators obtained a warrant to search the offices of both Star and Bizarre. During the search of the adjacent offices, Morton Gordon told the agents that he was the president and sole owner of Bizarre, and Nathan Grama identified himself as the president of Star.

### B. The Prosecutions of Carriere

The investigation commenced by Agent Whitaker in the Tallahassee video store resulted in multiple federal prosecutions of Carriere. The cash seized from the 1990 search of Multi–Media's offices produced a tax prosecution in the Northern District of Indiana. In August 1991, Carriere pled guilty to evading personal income taxes. He was sentenced principally to a three-year term of probation and a $250,000 fine. In April 1992, Carriere was charged with obscenity in the Northern District of Florida. Pursuant to Rule 20 of the Federal Rules of Criminal Procedure, the case was transferred to the Central District of California, where Carriere pled guilty to an obscenity charge arising out of the obscene videos Multi–Media had shipped to Tallahassee. His sentence in that case included another three-year probationary term, with a special condition of four months in home detention, and a $3,000 fine.

In January 1994, Carriere was indicted yet again on obscenity charges, this time in the Western District of Kentucky. Facing the prospect of a prison sentence in what was his third federal prosecution in as many years, Carriere decided to offer his cooperation to the government.

### C. The Investigation and Prosecution of Rothstein

At that time, Gene Malpas was the Department of Justice prosecutor in charge of the ongoing investigation into Rothstein—specifically, into Rothstein's connection with Bizarre. Malpas and Pellegrino believed that there was an obvious connection between Rothstein and Gordon, and between Bizarre and Star. They based that view on (1) the physical proximity of the two companies' offices, i.e., they shared a floor in the same Brooklyn building; (2) Bizarre's use of Star's shipping invoices; and (3) bank records showing unexplained money transfers between the two companies.[2] In short, Malpas believed that "Mr. Rothstein had much more connection to . . . Bizarre than would appear on any paperwork."

On March 18, 1994, Carriere was debriefed by Pellegrino and Malpas. Pellegrino's memorandum summarizing the interview reveals that Carriere gave the investigators the following information:

— Carriere had agreed with Bizarre to send Bizarre's promotional material to a group selected from Carriere's mailing list.

— The agreement originated with Carriere's former sales manager, Donald "Sandy" Sarnblad, who was a good friend of Rothstein's.

— According to Sarnblad, Rothstein had come to Sarnblad seeking to have Multi–Media sell Bizarre videos.

— Carriere finally agreed (after several importunings by Sarnblad) to include a page of Bizarre video titles in one of his mail order catalogues.

— The Bizarre titles sold well but were too expensive, so Carriere suggested that Sarnblad make a "cash deal" with Rothstein. Sarnblad did so, resulting in a substantial price break.

---

**2.** Malpas recalled such bank records when he was deposed in 1999, although there does not appear to be evidence of them in the record.

— To generate the cash for the Bizarre purchases, Multi–Media wrote checks to cash, cashed them, and delivered the cash to Rothstein in New York.

— Rothstein controlled Bizarre. All price discussions were with Rothstein. Although Gordon handled the "nuts and bolts" of the video sales, any matter of importance had to be decided by Rothstein. When Rothstein visited California (where Carriere had an office), he would discuss Bizarre business with Carriere. They would do the same when Carriere visited Rothstein's office in Brooklyn.

On February 7, 1996, 23 months after Carriere was debriefed by Pellegrino and Malpas, a grand jury in the Northern District of Florida returned a seven-count indictment charging Rothstein, Gordon, Sarnblad and Bizarre with various obscenity charges. All defendants were charged with conspiring to distribute obscene Bizarre videotapes.

As part of his cooperation, Carriere supplied Multi–Media documents to Malpas. In particular, Malpas asked Carriere for any records reflecting the delivery of cash to Rothstein for the Bizarre videotapes. Carriere produced records showing that Eric Gutterman, a longtime sales employee at Multi–Media, had delivered cash to New York. Carriere also facilitated an interview of Gutterman by Malpas and Pellegrino. When interviewed, Gutterman confirmed that he had delivered cash to Bizarre. Specifically, Gutterman stated that he had brought significant amounts of cash to New York and delivered it to Gordon at Bizarre's offices.

On January 13, 1997, Malpas made a motion to dismiss all charges against Rothstein and Sarnblad. The motion stated no reason for the relief it sought. On January 17, 1997, the district court granted the motion on a form order that provided no reason for the dismissal.

Although neither the prosecutor nor the court stated a reason for the dismissal, the record reveals that it was pursuant to an agreement between the parties. On November 18, 1996, Robert Katzberg, who is Rothstein's counsel in this case, and who was paid by Rothstein to represent Sarnblad in the criminal case, sent Malpas a letter referencing "our agreement that the government will dismiss the ... indictment against defendants Donald Sarnblad and Theodore Rothstein" in exchange for an affidavit from Sarnblad. The letter enclosed a draft of Sarnblad's affidavit for Malpas's approval.

Three days later, Katzberg wrote another letter to Malpas, stating: "Enclosed, pursuant to our agreement to dismiss with prejudice the above-captioned indictment against defendants Sarnblad and Rothstein, is a photocopy of a fully executed affidavit of Donald Sarnblad.... As I understand it, the United States will now move to dismiss against Sarnblad and Rothstein (with, of course, the consent of defendants)."

Sarnblad's affidavit admitted that as a Multi–Media employee, he was involved in the purchase of Bizarre videos. Sarnblad further admitted that he provided cash to another Multi–Media employee "to deliver as partial payment for the videos to Morton Gordon, the principal of Bizarre Video."

After the case was dismissed against Rothstein and Sarnblad, Gordon pled guilty.

D. *The Complaint in this Case and the Proceedings Below*

On December 15, 1997, Rothstein filed the complaint in this case. It charged Carriere and two corporations controlled by him (Multi–Media and Mark III Entertainment) with malicious prosecution, in-

tentional infliction of emotional distress, and with committing a prima facie tort. All of the claims were grounded on Rothstein's assertion that in 1994 Carriere falsely and maliciously told Pellegrino and Malpas that Rothstein was the true principal of Bizarre, resulting in the indictment of Rothstein. The claims arose under New York law, and the district court's jurisdiction was based on the diversity of citizenship of the parties.

The jury found for Rothstein on his claim of malicious prosecution. It found for Carriere on the claim of intentional infliction of emotional distress.[3] The jury awarded Rothstein $250,000 in compensatory damages for attorneys' fees and expenses incurred in the criminal case, and $1,000,000 in punitive damages. The district court reduced the compensatory damages to $128,078.19 because the evidence did not support the amount awarded. On May 24, 2002, judgment was entered for Rothstein, awarding him the latter amount in compensatory damages and $1,000,000 in punitive damages. This appeal followed.

## DISCUSSION

■ Because "accusers must be allowed room for benign misjudgments," the New York Court of Appeals has held that the law "places a heavy burden on malicious prosecution plaintiffs....". *Smith–Hunter v. Harvey*, 95 N.Y.2d 191, 195, 712 N.Y.S.2d 438, 734 N.E.2d 750 (2000). In order to prevail, they must establish four elements. First, the plaintiff must prove that the defendant initiated a criminal proceeding. Second, the proceeding must have been terminated favorably to the plaintiff. Third, the plaintiff must prove that there was no probable cause for the

criminal charge. Finally, the defendant must have acted maliciously. *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir.2003) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983)).

The proceedings below were infected by four errors, two of which were preserved for appellate review. One of these relates to the probable cause element; the district court disregarded the rule that a grand jury's indictment creates a presumption that the criminal proceeding was supported by probable cause. The second is that the district court erred by rejecting the argument that Rothstein failed, as a matter of law, to receive a "favorable termination" of the criminal proceeding as that phrase is defined by New York law.

As for the two unpreserved errors, one relates to the probable cause element (although in a different way than the presumption issue referred to above), and the other relates to the initiation element. Specifically, erroneous jury instructions were given on both elements. Moreover, a properly instructed jury could have reached but one conclusion on each: the prosecution of Rothstein was supported by probable cause; and Carriere did not initiate the prosecution. Though our resolution of these unpreserved issues is not necessary to our disposition of the case, we address them because the erroneous jury instructions implicate important limitations to the malicious prosecution cause of action.

A. *Probable Cause—The Effect of the Indictment*

■ "Once a suspect has been indicted ... the law holds that the Grand Jury

---

**3.** The third cause of action, alleging a prima facie tort, had been dismissed on Carriere's motion for summary judgment. Neither the prima facie tort claim nor the intentional infliction of emotional distress claim is at issue on this appeal.

action creates a presumption of probable cause." *Colon*, 60 N.Y.2d at 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248. "The presumption may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Id.* at 82–83, 468 N.Y.S.2d 453, 455 N.E.2d 1248. Thus, in order for a plaintiff to succeed in a malicious prosecution claim after having been indicted, "he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id.* at 83, 468 N.Y.S.2d 453, 455 N.E.2d 1248.

In this case, the government interviewed Carriere on March 18, 1994. In February 1996, nearly two years after the interview, Rothstein was indicted by a grand jury sitting in the Northern District of Florida. When Carriere moved for summary judgment below, his counsel asserted that Rothstein's indictment gave rise to a presumption of probable cause, and that summary judgment was warranted because "[w]e don't know what was presented before the grand jury." Counsel for Rothstein responded that he also did not know what evidence was presented to the grand jury, but that it did not matter. The district court agreed, stating as follows: "If in fact a person tells the police so and so is guilty of a felony and he maliciously lies about that, it doesn't matter what goes on before the grand jury."

In a motion for reconsideration, Carriere again argued that the district court "seemingly overlook[ed] established case law that the return of an indictment by the grand jury is *prima facie* evidence of probable cause. *Colon*, 60 N.Y.2d at 79, 468 N.Y.S.2d 453, 455 N.E.2d 1248." (Mar. 12,

2001 Mem. Supp. Def.'s Mot. Recons. at 5.) In response, Rothstein argued that *Colon* "is irrelevant to this litigation" because Rothstein's claims "are not premised on [Carriere's] grand jury testimony (whatever it may have been), but are based on what Carriere told Agent Pellegrino in March 1994....". (Mar. 15, 2001 Pl.'s Mem. Opp. Def.'s Mot. Recons. Den. Summ. J. ("Pl.'s Opp. Recons.") at 7–8.) In an order denying reconsideration, the district court again agreed with Rothstein, stating that "plaintiff's cause of action is based on statements defendant made to law enforcement agents, not to the grand jury."

■ This was error. Rothstein's cause of action is for malicious *prosecution*, not for maliciously making false statements to law enforcement authorities. A central issue in this case was whether the prosecution in question was initiated in the absence of probable cause to believe the crimes charged were committed by Rothstein. The grand jury's February 1996 indictment presumptively established that probable cause. Rothstein was required to rebut that presumption by proving fraud, perjury, suppression of evidence or other misconduct in the grand jury. His failure even to attempt to make that showing requires the dismissal of his claim.

On appeal, Rothstein makes three arguments on this issue. First, he asserts that Carriere defaulted on this issue below and thus may not now raise it on appeal. Specifically, Rothstein contends that "[t]he record is devoid of even a passing reference to a presumption regarding probable cause below." (Appellee's Br. at 26.) This argument is flatly refuted by the record. As set forth above, the presumption was explicitly raised in support of Carriere's motion for summary judgment, and Carriere's position was explicitly rejected by the district court. Carriere raised the pre-

sumption again in his motion for reconsideration, and again it was rejected. We therefore have difficulty understanding how counsel could assert in good faith that there was no reference to the issue below.

■ It is true that Carriere did not raise the issue for a third time at trial, but he was not obligated to do so. A motion pursuant to Rule 50 of the Federal Rules of Civil Procedure challenging the sufficiency of Rothstein's evidence to rebut the presumption might have been required to preserve the error if the district court had allowed the issue to be tried. But the court's ruling that the grand jury proceedings were irrelevant took the presumption out of the case entirely. In essence, the ruling granted partial summary judgment to Rothstein on the effect of the indictment.

■ As the Seventh Circuit has explained, a Rule 50 motion is required to preserve a challenge to the sufficiency of the evidence because once a trial has occurred, the focus is on the evidence that was actually admitted at trial, not on the earlier summary judgment record. *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718–19 (7th Cir.2003). However, where the trial court's denial of a summary judgment motion is not based on the sufficiency of the evidence, but on a question of law, the rationale behind Rule 50 does not apply, and the need for such an objection is absent. *Id.* at 719–20; *see also Wilson v. Union Pacific R.R. Co.*, 56 F.3d 1226, 1229 (10th Cir.1995) ("Not every denial of a motion for summary judgment requires a subsequent Rule 50 motion in order to be appealable. A critical distinction exists between summary judgment motions raising the sufficiency of the evidence to create a fact question for the jury and those raising a question of law that the court must decide. Where a motion for summary judgment based on an issue of law is de-

nied, appellate review of the motion is proper even if the case proceeds to trial and the moving party fails to make a subsequent Rule 50 motion.") (quotation marks and citation omitted).

The district court did not deny Carriere's motion for summary judgment on the ground that a trial was necessary to determine whether Rothstein could rebut the presumption established by New York law. Rather, it ruled that the presumption had no role in the case at all. The disposition of the issue in that manner, over Carriere's repeated objection, preserved it for our review.

■ Rothstein's second argument is that the presumption of probable cause raised by his indictment is "easily rebutted." (Appellee's Br. at 37.) The sole basis of his argument is the contention that Carriere testified in the grand jury, and therefore the indictment must have been procured by perjury. This argument is baseless. The burden of rebutting the presumption of probable cause requires the plaintiff to establish what occurred in the grand jury, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the "premise that the Grand Jury acts judicially[.]" *Colon*, 60 N.Y.2d at 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248. Here, the content of Carriere's grand jury testimony is unknown, as is the content of the rest of the government's presentation. Indeed, in arguing below that the grand jury proceedings were irrelevant, Rothstein's counsel conceded that he had no idea what happened before the grand jury. His belated argument that Carriere must have testified falsely to the grand jury amounts to rank speculation.

Third, Rothstein relies on *Russo v. New York*, 672 F.2d 1014 (2d Cir.1982), in contending that we have rejected a challenge

similar to Carriere's. *Russo*, however, did not involve a grand jury's indictment. Rather, the defendant there sought to ascribe presumptive effect to the issuance of an arrest warrant. We held, based on New York law, that the presumption is inapplicable where the warrant was issued based on the statements of the defendant in the malicious prosecution action. *Id.* at 1018. In this case, it cannot be said that the indictment was based on Carriere's testimony in the grand jury, let alone solely on that testimony. Rothstein has never claimed that it was, contending instead that his cause of action was "not premised on [Carriere's] grand jury testimony (whatever it may have been)," but on his 1994 interview. (Pl.'s Opp. Recons. at 8.) Indeed, Rothstein assiduously avoided any inquiry into the basis of the indictment. Thus, *Russo* provides no reason to find the presumption inapplicable in this case.

In sum, the district court's erroneous disregard of the presumption that probable cause supported the prosecution of Rothstein requires a reversal of the judgment in his favor. In other circumstances, the appropriate relief might be to remand for a new trial, at which a properly instructed jury could determine whether Rothstein has rebutted the presumption by showing that the grand jury proceedings were tainted by fraud or perjury. However, that is neither necessary nor appropriate here. Throughout the proceedings in the district court, Rothstein insisted that the grand jury presentation was irrelevant, and that he had no idea what had transpired there. For that reason, Carriere's motion for summary judgment should have been granted, and a remand for a trial on the issue would be futile.

### B. *Favorable Termination*

The district court held that, as a matter of law, the criminal prosecution had termi-nated in Rothstein's favor. Carriere contends on appeal that this was error. We agree. Indeed, the facts regarding the termination of the case require the opposite conclusion. As a matter of law, Rothstein failed to satisfy this element of the claim.

1. *The Procedural History in the District Court*

On July 28, 2000, the district court heard oral argument on Carriere's motion for summary judgment. The court rejected Carriere's argument that the dismissal of the indictment as against Rothstein did not constitute a "favorable termination" within the meaning of New York law. In doing so, the district court expressed its view that Rothstein, who had not cross-moved for summary judgment on the issue, might be entitled to it. Specifically, the district court observed that any dismissal of a prosecution that did not involve an admission of guilt by the defendant was a favorable termination:

> That element is about is there or isn't there a favorable termination. It doesn't really matter for that element what the reason was unless the reason related to him pleading guilty or something, the plaintiff pleading guilty or something like that. . . . That would not be considered favorable. It doesn't matter what the reason is, it is an element that requires that the proceeding be terminated favorably, and clearly it was.

When Carriere's counsel argued that it indeed mattered why the case was dismissed, the district court continued:

> What I'm saying is, the reason doesn't matter. Both sides spent a lot of time on the reason. What I'm saying is, unless the reason had something to do with the plaintiff, himself, Mr. Rothstein, himself, accepting some kind of liability

or responsibility, the reason why it is dismissed against him doesn't matter. The reason we have that element is just to make sure that somebody doesn't get [to] charge[ ] malicious prosecution who ultimately is found guilty of something.

At a pretrial conference on March 18, 2002, the court reiterated its view: "I would have thought a dismissal, an outright dismissal of a pending prosecution is a favorable termination whatever the reason is." However, since Rothstein had not moved for summary judgment on the favorable termination element, the district court's remarks left some uncertainty about whether it would be tried. In a letter dated April 3, 2002, just five days before the trial began, counsel for Carriere sought clarification of whether evidence could be offered on the issue at trial. On the morning of jury selection, the district court answered that question, resolving the issue in Rothstein's favor: "It's undisputed that the indictment against Mr. Rothstein was dismissed, and I don't see any indication, in the evidence that's being proffered by the defendant, that the dismissal was anything but a favorable termination." Thus, evidence on the issue was precluded, and the district court instructed the jury that the dismissal was a favorable termination.

### 2. New York Law Regarding the Favorable Termination Element

■ New York law does not require a malicious prosecution plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence. Rather, the plaintiff's burden is to demonstrate a final termination that is not inconsistent with innocence. *Smith–Hunter*, 95 N.Y.2d at 198–99, 712 N.Y.S.2d 438, 734 N.E.2d 750; *see also Cantalino v. Danner*, 96 N.Y.2d 391, 396, 729 N.Y.S.2d 405, 754 N.E.2d 164 (2001) ("[T]he ques-

tion is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused.").

■ As a general rule, a final termination of a criminal proceeding in favor of the accused is a favorable termination for the purposes of a subsequent malicious prosecution claim. *Smith–Hunter*, 95 N.Y.2d at 195, 712 N.Y.S.2d 438, 734 N.E.2d 750. However, this general rule is subject to certain exceptions. Misconduct of the accused that prevents a proper trial, for example, is one such exception, as is dismissal "out of mercy requested or accepted by the accused[.]" *Smith–Hunter*, 95 N.Y.2d at 196–97, 712 N.Y.S.2d 438, 734 N.E.2d 750. Another is particularly relevant to this appeal: "A termination is not favorable to the accused . . . if the charge is withdrawn or the prosecution abandoned pursuant to a compromise with the accused." *Id.* at 196, 712 N.Y.S.2d 438, 734 N.E.2d 750. This exception has its origin in *Halberstadt v. New York Life Ins. Co.*, 194 N.Y. 1, 86 N.E. 801 (1909), where the New York Court of Appeals stated as follows:

The first [rule] is that where a criminal proceeding has been terminated in favor of the accused by judicial action of the proper court or official in any way involving the merits or propriety of the proceeding or by a dismissal or discontinuance based on some act chargeable to the complainant as his consent or his withdrawal or abandonment of his prosecution, a foundation in this respect has been laid for an action of malicious prosecution. The other and reverse rule is that where the proceeding has been terminated without regard to its merits or propriety *by agreement or settlement of the parties* or solely by the procurement of the accused as a matter of favor or as the result of some act, trick or device preventing action and consideration by

the court, *there is no such [favorable] termination. . . .*

*Id.* at 10–11, 86 N.E. 801 (emphasis added); *see also Martinez v. City of Schenectady,* 97 N.Y.2d 78, 84, 735 N.Y.S.2d 868, 761 N.E.2d 560 (2001) ("A termination is not favorable ... where a prosecution ends because of a compromise with the accused"). The rule mirrors the *Restatement (Second) of Torts* § 660 (1977) ("*Restatement*"), which provides that a "termination of criminal proceedings in favor of the accused other than by acquittal is not a sufficient termination to meet the requirements of a cause of action for malicious prosecution if ... the prosecution [is] abandoned pursuant to an agreement of compromise with the accused."[4]

■■■■ In order for the compromise of a criminal case to defeat a subsequent malicious prosecution claim, it is not required that the defendant in the criminal case admit his guilt. The commentary to the *Restatement* § 660 makes this clear: "Although the accused by his acceptance of a compromise does not admit his guilt, the fact of compromise indicates that the question of his guilt or innocence is left open. *Having bought peace the accused may not thereafter assert that the proceedings have terminated in his favor.*" *Restatement* § 660, cmt. c (emphasis added). Perhaps the best illustration of this principle is a disposition pursuant to section 170.55 of New York's Criminal Procedure Law, which authorizes adjournments in contemplation of dismissal. In this type of compromise, the criminal case is adjourned before the entry of a plea, based on the prosecutor's belief that there will ultimately be a dismissal of the accusatory instrument in the interest of justice. N.Y.Crim.

Proc. Law § 170.55[1]-[2]. When the charge is later dismissed, the person charged is "entitled to the full benefit of the record sealing and expunging provisions" that attend an acquittal, with the effect that charge is treated "as though it never had been brought." *Hollender v. Trump Vill. Coop., Inc.,* 58 N.Y.2d 420, 425, 461 N.Y.S.2d 765, 448 N.E.2d 432 (1983). Nevertheless, such a termination extinguishes a malicious prosecution claim, *see Smith–Hunter,* 95 N.Y.2d at 197, 712 N.Y.S.2d 438, 734 N.E.2d 750 (reaffirming *Hollender's* holding that an adjournment in contemplation of dismissal does not produce a "favorable termination")—not because the defendant has admitted guilt, but because it is a bargained-for dismissal of the criminal case.

### 3. *The Dismissal in this Case*

■■■■ The undisputed facts of this case preclude Rothstein from carrying his burden of proof that he obtained a favorable termination of his criminal case. As set forth below, Rothstein fought hard and successfully to suppress the testimony of Malpas (the prosecutor) and Pellegrino (the FBI Agent) about why the government moved to dismiss the charges against him. Notwithstanding those efforts, the record shows that Rothstein and Sarnblad compromised the criminal case in a way that precludes Rothstein's malicious prosecution claim against Carriere.

The individual defendants in Rothstein's indictment were Rothstein, Sarnblad and Gordon. The indictment charged, among other things, that Gordon shipped obscene videos from Bizarre's offices in New York to Multi–Media in Indiana, which then shipped the videos to the Northern Dis-

---

4. The New York Court of Appeals has repeatedly cited the *Restatement* § 660 with approval, as has this Court when applying New York law in malicious prosecution cases. *See,*

*e.g., Smith–Hunter,* 95 N.Y.2d at 195–98, 712 N.Y.S.2d 438, 734 N.E.2d 750; *Murphy v. Lynn,* 118 F.3d 938, 947–49 (2d Cir.1997).

trict of Florida. In November 1996, Rothstein and Sarnblad reached an agreement with the government to dismiss the claims against them in exchange for an affidavit by Sarnblad that implicated Gordon in the charged crimes. In the affidavit, Sarnblad admitted his involvement in Multi–Media's purchases of videos from Bizarre, and further stated that he supplied cash to a Multi–Media employee for delivery to Gordon as partial payment for the videos. In exchange for what Rothstein concedes was "a useful piece of evidence to the government" (Appellee's Br. at 45), Malpas agreed to dismiss the charges against Rothstein and Sarnblad. Having bought his peace with the government, Rothstein may not assert that the criminal case terminated in his favor.

Rothstein's arguments on this issue are easily dismissed. First, he contends that only Sarnblad bargained with the government for a dismissal. This is false. Sarnblad's affidavit implicating himself and Gordon was sent to Malpas by Katzberg, Rothstein's attorney in this case, who was paid by Rothstein to represent Sarnblad in the criminal case. Katzberg's letter stated as follows: "Enclosed, pursuant to *our agreement to dismiss with prejudice the above-captioned indictment against defendants Sarnblad and Rothstein,* is a photocopy ... of [Sarnblad's] affidavit .... As I understand it, the United States will now move to dismiss against Sarnblad and Rothstein (*with, of course, the consent of*

*the defendants* ) . . . .". (Emphasis added). Three days earlier, when forwarding the draft affidavit for Malpas's approval, Katzberg also referred to *"our agreement that the government will dismiss the . . . indictment against defendants Donald Sarnblad and Theodore Rothstein . . . ".* (Emphasis added). In light of those statements, the argument on this appeal that Rothstein did not bargain for the dismissal of the charges against him rings especially hollow.[5]

Second, Rothstein claims that Sarnblad's affidavit exonerated Rothstein. That claim is also false. Sarnblad's one-paragraph affidavit makes no mention of Rothstein, and is entirely consistent with the government's theory that Rothstein had a hidden interest in Bizarre. In any event, the argument misses the point. The dismissal of Rothstein's case precludes his malicious prosecution claim not because it is inconsistent with his innocence, but because it was the result of a consensual agreement to end the case against him.

Third, Rothstein contends that he made no concession of guilt in return for the dismissal of the indictment. The district court erroneously concluded that such a concession was necessary before a compromise of a criminal case can extinguish a malicious prosecution claim. As discussed above, New York law provides otherwise. By agreeing to provide useful evidence against Gordon in exchange for the dis-

---

**5.** Arguing the Rothstein had no part in Sarnblad's agreement, Katzberg told the district court that the only evidence to the contrary "are two cover letters from Sarnblad's attorney, each inadmissible as rank hearsay. . . .". (Mem. Law Opp. Def.'s Mot. to Have the Issue of "Favorable Termination" on Pl.'s Malicious Prosecution Claim Submitted as a Question of Fact for the Jury to Decide at 5.) Of course, "Sarnblad's attorney" had been Katzberg himself, who was disparaging as "rank hearsay" his own written representations, quoted in the text above, that Rothstein and Sarnblad had compromised the criminal case together.

missal of the charges against themselves, Rothstein and Sarnblad consented to a termination of the case that left open the question of their own guilt or innocence. The fact that the evidence was provided in an affidavit signed by Sarnblad, rather than by Rothstein, is of no moment. The indisputable fact is that the prosecutor dismissed the cases against *both* Rothstein and Sarnblad pursuant to a compromise with *both*. As a matter of law, that is all that was needed to defeat Rothstein's malicious prosecution claim, as "[a] termination is not favorable to the accused ... if the charge is withdrawn or the prosecution abandoned pursuant to a compromise with the accused." *Smith–Hunter,* 95 N.Y.2d at 196–97, 712 N.Y.S.2d 438, 734 N.E.2d 750.

Finally, ignoring the documentary evidence that the case was dismissed based on the agreement described above, Rothstein argues that the indictment was dismissed as against him because "Malpas and Pellegrino learned that Carriere had lied to them." (Appellee's Br. at 12; *see also id.* at 13 (Malpas "[o]bviously determin[ed] that Carriere's claims were bogus").) There is no support for that claim anywhere in the record. Indeed, the record reveals that Rothstein vigorously and successfully sought to *suppress* any testimony on the subject by Malpas, the prosecutor who dismissed the case. As for Pellegrino, he testified that he believed Carriere at all times, and never had reason to believe he had lied. The jury never heard that testimony, however, because Rothstein moved in limine to preclude it and the district court granted the motion.

Malpas testified at trial by deposition. The portions of his deposition that were *not* read to the jury demonstrate that

Katzberg's strategy on Rothstein's behalf was to preclude any testimony by Malpas about whether Malpas believed Carriere and why the government dismissed the charges:

Q: Have you had anything come to your attention through Mr. Carriere or otherwise that indicated that Mr. Carriere was lying when he told you that [Rothstein had an interest in Bizarre]?

Katzberg: Objection ....

...

Q: Based upon your corroboration [of Carriere] did you find what he told you by and large was true?

Katzberg: Objection....

...

Q: As a result of your looking into the matter, were the matters that Mr. Carriere described to you corroborated by your investigation?

Katzberg: Objection ... We don't know what matters we are talking about.... And we don't know what you mean by corroboration. Are you talking about documents or another witness? [6]

...

Q: Insofar as your investigation, has there been [sic] anything come to your attention since that time that indicates or sets out that Mr. Carriere is not telling the truth?

Katzberg: Objection....

Having steadfastly prevented any testimony by Malpas on the question whether he believed Carriere was telling the truth, Rothstein's claim on appeal that Malpas

---

**6.** Katzberg continued to object to testimony by Malpas about "any form" of corroboration of Carriere's statements.

believed Carriere had lied is somewhat disingenuous.[7]

The record does reveal that Pellegrino believed Carriere had been truthful. He so testified at his deposition. That testimony was not read to the jury at trial, however, because Katzberg successfully moved in limine to preclude it. In arguing that such testimony should be precluded, Katzberg complained that, "interesting[ly] enough," Malpas "declined to answer that question . . . .". Katzberg did not disclose to the district court that he had successfully *objected* to the question when it was posed to Malpas. In any event, the district court granted the motion, precluding Pellegrino's testimony. Thus, the jury was not informed that Pellegrino believed Carriere had been truthful. Nor was it informed that Malpas had been prevented, by both Rothstein's counsel and the government, from testifying about whether he believed Carriere and why the indictment was dismissed. Nevertheless, in summation, Katzberg argued that "the government dismissed its case against Rothstein when they realized that Carriere had lied," and that "Pellegrino and Malpas both realized that they basically indicted two innocent men based upon the lies that Mr. Carriere told them . . . .". That argument, which has been raised again on this appeal, is baseless.

In sum, Rothstein's agreement with the government that it would dismiss the criminal case against him in exchange for an affidavit from Sarnblad precludes Rothstein from establishing the favorable termination required by New York law.

## C. *Other Errors*

At the heart of the district court's error with respect to the effect of the 1996 grand jury indictment was an unduly narrow focus on Carriere's March 18, 1994, interview with the FBI. In the district court's view, a person who falsely tells the police that someone has committed a felony may be liable for malicious prosecution no "matter what goes on before the grand jury." To the contrary, as discussed above, unless the plaintiff can demonstrate that the proceedings before the grand jury were tainted, an indictment extinguishes the claim.

This focus on the 1994 interview spawned other errors as well. The trial court's charge focused solely on that interview as determinative of whether there was probable cause to arrest Rothstein and whether Carriere initiated the criminal proceeding against him. Specifically, the jury was told that if it found that Carriere lied to the FBI on March 18, 1994, then it should further find both that there was no probable cause to arrest Rothstein and that Carriere initiated the prosecution. As discussed below, these instructions were erroneous. Moreover, on the evidence presented at trial, a properly instructed jury could have reached but one

---

7. Katzberg was *not* the only attorney at Malpas's deposition who was determined to keep Malpas from stating whether the prosecutor believed Carriere. As a government employee, Malpas was represented at the deposition by an Assistant United States Attorney ("AUSA"), Kevin Mulry. At Mulry's instruction, Malpas was prohibited from answering questions about whether he believed Carriere. According to AUSA Mulry, testimony regarding why the case was dismissed "goes beyond the authorization provided." As a result, through the joint efforts of Rothstein's counsel and the government itself, the record does not reflect the prosecutor's direct testimony about whether he believed Carriere. However, the fact that Malpas moved pursuant to U.S.S.G. § 5K1.1 to authorize a downward departure in Carriere's criminal case in the Western District of Kentucky, and never sought to withdraw that motion, is strong circumstantial evidence that Malpas believed Carriere had been truthful.

conclusion on each these issues, *i.e.*, there was probable cause to arrest Rothstein, and Carriere did not initiate the criminal proceeding.

### 1. Carriere's Procedural Default

 In addressing these claims, we are mindful that Carriere did not object to the erroneous jury instructions. *See* Fed. R.Civ.P. 51; *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir.1992) ("Absent objection, an error may be pursued on appeal only if it is 'plain error' that may result in a miscarriage of justice, or in 'obvious instances of ... misapplied law.'") (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 256, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)). More importantly, he did not move at trial for judgment as a matter of law, either at the close of the evidence or after the jury returned its verdict in Rothstein's favor. *See* Fed.R.Civ.P. 50(a)-(b). Ordinarily, those failings would be fatal to Carriere's challenge to the sufficiency of the evidence supporting the malicious prosecution claim on this appeal. As a general rule, "a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). More specifically, "[i]t is well established that a party is not entitled to challenge on appeal the sufficiency of evidence to support the jury's verdict on a given issue unless it has timely moved in the district court for judgment as a matter of law on that issue." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 164 (2d Cir.1998).

 Where, as here, a party has failed to justify a failure to comply with Rule 50, this Court may review the defaulted claim only if such review is necessary "to prevent manifest injustice." *Id.; see also Provost v. City of Newburgh*, 262 F.3d 146, 162 (2d Cir.2001) (no "manifest injustice"

where it was doubtful that proponent would have prevailed on claim); *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 129 (2d Cir.1999) ("We may overlook [a Rule 50] default in order to prevent a manifest injustice in cases where a jury's verdict is wholly without legal support.") (quotation marks and alteration omitted); *Kirsch*, 148 F.3d at 164–65 (no "manifest injustice" where jury permissibly found for plaintiff, and "had defendants raised the issue at trial, it may be that [plaintiff] would have been able to present additional evidence" in support of plaintiff's claim); *Doctor's Assocs., Inc. v. Weible*, 92 F.3d 108, 114 (2d Cir.1996) (where defendant "did not (and could not) present evidence to sustain a verdict" on abuse of process counterclaim, failure to bring Rule 50(a) motion specifically challenging that claim did not bar appellate court from overturning verdict).

Even in the absence of the procedural default, Carriere's challenges to the sufficiency of the evidence require him to meet a stringent standard. Judgment as a matter of law is not warranted "unless the evidence, viewed in the light most favorable to [Rothstein] is insufficient to permit a reasonable juror to find in [Rothstein's] favor." *Provost*, 262 F.3d at 154 (quotation marks and citation omitted).

We need not decide whether, given these strict standards, the erroneous jury instructions independently justify the reversal of the judgment below. Reversal is already required due to the preserved errors discussed above. However, while acknowledging that these issues are not essential to our resolution of the appeal, we address them below because the instructions at issue, if repeated in future cases, could have the effect of unduly discouraging the flow of truthful information to law enforcement authorities.

### 2. Probable Cause to Arrest Rothstein

■■■■■ "The essence of malicious prosecution is the perversion of proper legal procedures." *Broughton v. State,* 37 N.Y.2d 451, 457, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975). The wrong does not occur unless, among other things, the defendant commences or continues a criminal proceeding against the plaintiff. *Id.* ("[I]t has been held that some sort of prior judicial proceeding is the *sine qua non* of a cause of action in malicious prosecution."). Since the cause of action vindicates the right to "freedom from unjustifiable litigation," the plaintiff must plead and prove that the prosecution was unjustified, that is, that it was commenced (or continued) in the absence of probable cause. *Id.*

In this case, the jury was not told that it should determine whether there was an absence of probable cause in February 1996, when the prosecution of Rothstein was commenced. Rather, it was instructed to focus on March 18, 1994, when Carriere was interviewed by the government. Specifically, the jury was told as follows:

> The test of probable cause is to be applied as of the time when the action complained of was taken. Thus, whether Mr. Carriere had probable cause depends on the facts and circumstances known, or reasonably believed to be true, by Mr. Carriere at the time he provided the information to law enforcement agents.

The court further instructed the jury that if it found that Carriere falsely implicated Rothstein as a principal of Bizarre, then probable cause did not exist:

> If Mr. Carriere knew the information he was providing to law enforcement about Mr. Rothstein was false, that is, that it was untrue, then he did not have probable cause to believe Mr. Rothstein was guilty of a crime.

■■■■ Thus, the jury was told that if it found that Carriere gave false statements to the FBI, it should further find that there was no probable cause to arrest Rothstein. These instructions were erroneous. The existence or nonexistence of probable cause in a malicious prosecution suit is not determined as of the time the defendant gave information to the government.[8] Rather, it is determined, at the earliest, as of the time prosecution is commenced. *See N.Y. Pattern Jury Instructions—Civil* PJI 3:50 (Dec.2003) ("In order to recover, the plaintiff must establish that, *at the time the prosecution was initiated,*" there was no probable cause) (emphasis supplied).

■■■■ In this case, the existence of probable cause to believe Rothstein committed the obscenity charges in the indictment could not have been clearer. Probable cause to arrest exists where the facts and circumstances are sufficient "to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *United States v. Fisher,* 702 F.2d 372, 375 (2d Cir.1983). The offenses for which Rothstein was held suspect were obscenity charges arising out of Bizarre's distribution of videos. The central factual issue was whether Rothstein was an undisclosed principal of Bizarre, *i.e.,* whether Gordon was his front. On that question, there was the following evidence.

---

**8.** Another defect in the district court's charge to the jury was the suggestion in the excerpts quoted above that Carriere was required to have probable cause to believe Rothstein was guilty of a crime when Carriere spoke to the government. To the contrary, it was Rothstein's burden to prove the absence of probable cause (in 1996), not Carriere's burden to prove its existence in 1994.

In the late 1980s, Rothstein had started Gordon, a childhood friend, in the pornography business after Gordon left his unsuccessful career as a furniture salesman. Gordon knew nothing about the pornography business. Rothstein suggested that Gordon consider purchasing Bizarre, which was then a California company with which Rothstein did business. Rothstein introduced Gordon to Bizarre's previous owner and accompanied Gordon to California when Gordon bought the business.

After Bizarre was acquired, Rothstein moved all of his pornography businesses into a single 40,000 foot location at 20–40 Jay Street in Brooklyn, New York, and Bizarre joined them in that space. With the addition of Bizarre, there were four companies in the pornography distribution business on the same floor of that building. They were divided by medium: Star distributed magazines; Brett (d/b/a Media Distributors) distributed newspapers; Novelties by Nasswalk distributed novelties; and Bizarre distributed videos. Rothstein admittedly had an interest in all of the companies except Bizarre, which happened to be the subject of Malpas's investigation because its obscene videos had been shipped by Carriere to Florida. A fifth company on the premises, Pro–Vid, was also owned by Rothstein, and it performed consulting services in the pornography industry.

Rothstein admitted that he helped his inexperienced friend Gordon run Bizarre. Bizarre shared office space and warehouse space with Rothstein's other companies, and it shared shipping invoices with Star. Elisa Salvio, Bizarre's office manager, would simply cross off Star's name on the preprinted forms and write in "Bizarre." Star paid the invoices, and Bizarre would reimburse Star. Salvio testified that this close relationship between Star and Bizarre caused people who dealt with them to confuse the two companies. As Salvio put it: "We were separate businesses, but we were like all together."

Bizarre not only fit neatly into Rothstein's constellation of pornography businesses, and it not only shared space and invoices with Rothstein's companies, it shared employees as well. When Salvio left Bizarre, she became the office manager for Novelties by Nasswalk. Rothstein acknowledged at trial that, among the various other ways he assisted Gordon in running Bizarre, he helped him procure employees.

Michael Warner, a printer who did work for Rothstein and Carriere, testified that because of periodic raids, pornographers used other people as fronts for their businesses. Indeed, Warner testified that Rothstein was perceived as owning many pornography businesses in addition to the ones he owns on paper. Finally, Rothstein drew $3,000 per month out of Bizarre, purportedly as a consulting fee. He testified that he received this fee for about three years. The money was paid to Pro–Vid.

Based on the foregoing facts—none of which came from Carriere—the relationship between Rothstein and Bizarre would warrant a reasonable person in the belief that Rothstein was a hidden principal in Bizarre. Had these facts been presented to the grand jury, it would no doubt have reached that conclusion. At the trial below, no rational juror, properly instructed, could have concluded otherwise.

### 3. *The Initiation of the Prosecution*

A plaintiff in a malicious prosecution case must prove that the defendant initiated the criminal proceeding. As we have stated before, reporting a crime to law enforcement and giving testimony does not constitute the "initiation" of a criminal prosecution. *See Rohman v. New York*

*City Transit Auth.*, 215 F.3d 208, 217 (2d Cir.2000). More is required. Specifically, the complainant must have played an " 'active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " *Id.* (quoting *DeFilippo v. County of Nassau*, 183 A.D.2d 695, 583 N.Y.S.2d 283, 284 (2d Dep't 1992)).

 The jury in the trial below was instructed as follows with respect to the initiation element:

> One who merely responds to requests for information [from law enforcement] does not initiate or continue a prosecution. There must be some affirmative acting by way of advice, encouragement or pressure in the initiation, or causing the initiation, or the prosecution or in affirmatively encouraging its continuation after it has been initiated.

These instructions were consistent with New York law. However, the trial court further instructed the jury as follows:

> If you find that Mr. Carriere knowingly gave false information about Mr. Rothstein to an FBI agent or prosecutor that a reasonable person would realize would cause them to prosecute Mr. Rothstein, then you should find that Mr. Carriere is responsible for the prosecution and that this first element is proved.

These instructions were incorrect. It is true that a jury may rely upon false statements to law enforcement in determining that a person initiated a prosecution, but it may not do so to the exclusion of other evidence on the issue. Particularly where, as here, the criminal charge is the culmination of a lengthy investigation involving various sources of evidence, the mere fact that a witness provided false information to the government does not warrant a conclusion that the witness initiated the prosecution where the rest of the evidence suggests otherwise. *See Brown v. Sears*

*Roebuck and Co.*, 297 A.D.2d 205, 746 N.Y.S.2d 141, 146 (1st Dep't 2002) ("While it is true that a defendant may be said to have initiated a criminal proceeding by providing false evidence to the police or withholding evidence that might affect the determination by the police to make an arrest, the record in this case conclusively demonstrates that the allegedly false evidence provided by Sankar did not contribute to the determination to arrest plaintiff.") (internal citations omitted).

 The district court's charge essentially directed the jury to find that Carriere initiated the criminal case against Rothstein if it found that Carriere lied to the FBI on March 18, 1994. Had the jury been instructed to consider all the evidence on the issue, the only rational conclusion it could have reached from the evidence at trial is that Carriere did *not* initiate the prosecution.

As discussed above, the investigation that resulted in Rothstein's indictment began in 1990, when Agent Whitaker found obscene materials in a Tallahassee video store. The subsequent searches of Multi-Media's Indiana offices and of the Brooklyn building shared by Star and Bizarre uncovered significant circumstantial evidence linking Rothstein to Bizarre, causing the FBI to target Rothstein before Carriere began to cooperate. Indeed, the prosecutor testified unequivocally and without contradiction that "the idea of prosecuting anybody didn't come from Mark Carriere." Moreover, although Carriere no doubt sought to benefit from cooperating with the government, there is simply no evidence that he played an active role in the prosecution, or encouraged or importuned the prosecutor to act against Rothstein.

We emphasize the significance of the duration and complexity of the criminal investigation, and of the prosecutor's un-

controverted testimony that the decision to seek an indictment of Rothstein was initiated by the Department of Justice, not Carriere or any other witness. In these circumstances, Rothstein's effort to prove the initiation element of his claim failed as a matter of law.

### 4. The Adverse Effect of the Erroneous Instructions

By allowing both the probable cause element and the initiation element to hinge solely on whether the jury concluded that Carriere made false statements in his 1994 interview, the trial below created a troubling precedent. Persons with knowledge of criminal activity—even persons who are themselves charged with crimes—are not required to have probable cause to believe another person has committed a crime before reporting their knowledge to the police. Such a rule would pose an intolerable impediment to the free flow of information to the police.

Similarly, if, after such a report is made, the accused is later charged in a criminal case that terminates in his favor, the law places important limits on the accused's right to seek damages from the complainant. Significantly, it is not enough for the accused, in a subsequent civil trial, to prevail simply by proving that the complainant told lies to the police. Indeed, if that were enough, an acquitted defendant could haul into court anyone who provided incriminating information to the government during the investigation. If the acquitted defendant then persuades a jury by a mere preponderance of the evidence that the complainant told malicious lies when providing the incriminating information, the complainant would be required to pay damages. In this case, those damages included $1,000,000 in punitive damages. While those potential consequences might deter persons from providing false information to the government, we have little doubt that they would deter the provision of truthful information as well. Indeed, "[s]uch a rule would not only inhibit the furnishing of testimony by key witnesses, it would tend to make all such witnesses 'interested' in the outcome of the prosecution, since only a conviction of the accused would immunize them from civil suit." Whittaker v. Duke, 473 F.Supp. 908, 912 (S.D.N.Y.1979) (Sand, J.).

Accordingly, the law prohibits such claims by requiring a malicious prosecution plaintiff to do more than simply prevail in a credibility contest with his accuser. If the criminal prosecution was otherwise supported by probable cause, for example, the malicious prosecution claim is unavailable, even if the accuser lied. Similarly, if the criminal proceeding was initiated by someone else, the claim is unavailable, again, even if the accuser lied. These limitations on the cause of action were not designed to protect false accusers, but rather to ensure that truthful ones are not discouraged from coming forward. By erroneously permitting a finding that Carriere lied to the government to satisfy both the probable cause and the initiation elements of Rothstein's claim, the district court stripped away these limitations. However undeserving Carriere himself may be, the public policy of fostering the flow of information to law enforcement authorities requires that they not be stripped away in future cases.

### CONCLUSION

For the foregoing reasons, the judgment is reversed and the case is remanded to the district court with instructions to enter judgment for Carriere.