Arra M. LAWSON and Melissa Lawson, Plaintiffs

v.

NEW YORK BILLIARDS CORP. d/b/a Chelsea Bar & Billiards, Louis Paloubis and Aristotle Hatzigeorgiou Defendants.

No. 02–CV–1495 (ILG).

United States District Court, E.D. New York.

Aug. 10, 2004.

Ronald D. Coleman, Coleman Law Firm, New York, NY, Steven B. Samuel, Samuel & Weininger, Lake Success, NY, for plaintiffs.

Vincent P. Crisci, Law Office of Vincent P. Crisci, New York, NY, for defendant.

## MEMORANDUM & ORDER

GLASSER, District Judge.

This motion arises out of a lawsuit brought by plaintiffs Arra Lawson and his wife, Melissa Lawson, against defendants New York Billiards Corporation, doing business as Chelsea Bar & Billiards, Louis Paloubis, and Aristotle Hatzigeorgiou. The complaint alleges breach of employment contract and wrongful discharge, malicious prosecution, intentional infliction of emotional distress, slander and libel, and loss of consortium. For the reasons that follow, defendants' motion for summary judgment is granted in part and denied in part.

## FACTUAL BACKGROUND

From May 2000 until December 2000, Arra Lawson ("Lawson") was employed as the executive chef of Chelsea Bar & Billiards ("Chelsea"), a pool hall and restaurant that is owned and operated by New York Billiards Corporation. (Hatzigeorgiou Dep.) Defendant Aristotle Hatzigeorgiou ("Hatzigeorgiou") is the president of New York Billiards Corporation. (*Id.* at 5.) Defendant Louis Paloubis ("Paloubis") is an officer of New York Billiards Corporation and managed Chelsea's payroll during all times relevant to this lawsuit. (Paloubis Dep. at 4–10.)

In May of 2000, upon learning of an executive chef position at Chelsea from a recruiter, Lawson interviewed with Hatzigeorgiou. Hatzigeorgiou later extended an offer of employment to Lawson, which he accepted. (Def. Local Rule 56.1 Statement at 2; Pl. Local Rule 56.1 Statement ¶¶ 1, 2.) At the time Lawson accepted the offer of employment, he did not sign an employment contract. (Def. Local Rule 56.1 Statement at 2.) As executive chef, Lawson's duties included ordering food, hiring and firing staff, and generally running the kitchen. (*Id.*) Lawson claims that he was offered an annual salary of $70,000 to be paid partly in cash and partly by check, as well as a fixed percentage of receipts from parties held at Chelsea. Although defendants appear to have taken a different position before other adjudicative bodies, for purposes of this motion they concur that Lawson was offered an annual salary of $70,000 to be paid in cash and by check.

In June of 2000, Lawson alleges that he and other Chelsea employees were called to a meeting where they were provided with an employee manual. (Lawson Aff. ¶ 6.) The manual listed a number of "General Rules," including procedures for "clocking-in," a prohibition against personal phone calls, and rules regarding eating and drinking alcohol while on the job. In

addition, the manual contains the following provision:

### Termination

We have a progressive discipline system at Chelsea Bar and Billiards. Unless you commit any of the major violations listed above, you will not be fired without [sic] warning. The first time you break a rule you will be given a verbal warning, which may or may not go in your employee file. The second time you break the same rule you will be written up, and asked to sign off on your write up. If you break the same rule repeatedly you will be terminated. Also if you continue to break many different rules you risk being terminated.

(Exume Aff. Ex. A.) Lawson claims that he signed a copy of the manual which was kept in his personnel file and retained an unsigned copy. (Lawson Aff. ¶ 12.) According to Lawson, he inquired about the termination clause at this meeting and was told that no employee could be fired without a valid warning, written and oral, as stated in the manual.[1] (Pl. Mem. at 3.)

On December 11, 2000 Hatzigeorgiou phoned Lawson and terminated his employment at Chelsea and, according to Lawson, stated that he believed Lawson had taken food from the kitchen. (Lawson Aff. ¶ 27; Lawson Dep. 193.) Lawson, however, believed that Hatzigeorgiou was terminating his employment for a different reason. According to Lawson, during his employment with Chelsea, he asked Hatzigeorgiou several times for tax forms in order to report his cash income to the IRS. (Lawson Dep. at 150, 197.) Lawson alleges that Hatzigeorgiou responded by threatening to "make trouble" for him. (Lawson Dep. at 151.) Furthermore, Lawson claims to have overheard several conversations between Hatzigeorgiou and the Chelsea accountant regarding a plan to hide revenue from the IRS. Lawson alleges that he was in fact terminated by defendants because they believed he had contacted the IRS about these conversations and that Hatzigeorgiou admitted as much during a conversation on December 12, 2000. (Lawson Dep. 198–99.)

On December 12, 2000, Lawson and his wife retrieved his personal belongings from Chelsea, which included a blow torch, kitchen tools, knives, knife sharpener, uniforms, and mixing bowls. (Lawson Dep. at 211.) According to Lawson, he did not leave Chelsea with a pasta machine, although he does own one. (*Id.* at 241.) Lawson also stated in deposition that the knife sharpener he retrieved from Chelsea on December 12, 2000 was his own and that during his tenure at Chelsea, he ordered another knife sharpener for the kitchen, which was paid for by Paloubis. (*Id.* at 248.)

In his deposition, Paloubis said that he "believe[s]" Lawson took a milk shake machine and knife sharpener on December 12, 2000, because he "saw him take the knife sharpener out of the establishment." (Paloubis Dep. at 46.) Paloubis was "not sure" whether there was a milk shake machine in the box Lawson used to transport the items from Chelsea to his car. (*Id.* at 48.) When asked by Paloubis about the items in the box, Lawson stated that they were his. (*Id.* at 49–50.) In deposition, Hatzigeorgiou could not recall which Chelsea employee reported to him that items were missing from the kitchen. (Hatzigeorgiou Dep. at 49.) David Drost, the general manager of Chelsea, notified the police that Lawson had departed Chelsea with several items that were not his. (*Id.* at 51.) In a criminal complaint

---

1. Plaintiffs support this assertion with an affidavit by another Chelsea employee, Brian Lai, who claims to have been present at the June meeting when the manual was distributed. (Exume Aff. Ex. B.) His affidavit is unsworn.

against Lawson dated February 4, 2001, Paloubis alleges that Lawson committed petit larceny:

> [Deponent] observed defendant leaving the above location with a box containing several items, which included, but was not limited to, a "three-stone" knife sharpener that belonged to Chelsea Bar & Billiards and not to the defendant. ... [I]mmediately after defendant left the location, deponent checked the kitchen of Chelsea Bar & Billiards and discovered a few items were missing, to wit: one (1) "three oil stone" knife sharpener, one (1) pasta machine and (1) malt mixer. Deponent states that said items were in the kitchen before defendant entered the kitchen and then left the kitchen carrying the above-referenced box.

(Exume Aff. Ex. J.) In a signed, unsworn affidavit submitted by plaintiffs, a former employee of Chelsea, Brian Lai ("Lai"), states that Lawson was a "good worker." (Exume Aff. Ex. B, Lai Aff. ¶ 5.) He goes on to report that on December 12, 2000, Lawson retrieved his personal belongings from Chelsea, which did not include a milkshake machine. (Lai Aff. ¶ 20–22.) According to Lai, several days later, defendants told him that a knife sharpener that might have belonged to Chelsea was missing. (*Id.* ¶ 23–24.) Lai states that he personally used Chelsea's milkshake machine after December 12, 2000 and does not know what was meant by the "pasta machine." (*Id.* ¶ 30–31.) This affidavit is dated January 12, 2004.

In a sworn affidavit submitted by defendants, signed on January 19, 2004, Lai makes sharply contradicting statements. (Kates Reply Aff. Ex. D, Lai Aff. II.) Specifically, he states that he did not believe that Lawson's culinary abilities were good enough. (*Id.* ¶ 3.) Regarding the incident of December 12, 2000, he states that after Lawson left, the kitchen personnel noticed that the knife sharpener was missing and that he believes it was taken by Lawson, although it might have been "an honest mistake." (*Id.* ¶ 5–7.) He states that he does not know whether Lawson stole anything from the kitchen. (*Id.* ¶ 9.)

On January 1, 2001, Lawson and his wife returned to Chelsea to photograph the menu that he had created, which was still hanging in the window. (Lawson Aff.) According to Melissa Lawson, she received a phone call on January 2, 2001 from Hatzigeorgiou who stated that he would have Lawson arrested for photographing the menu, and that everyone would believe Hatzigeorgiou's accusations because Lawson is "young and black." (Pl. Local Rule 56.1 Statement ¶ 9.) On January 8, 2001, Lawson received a call from Roy Ruland ("Ruland") of the New York City Police Department who told Lawson that he was being charged with theft in connection with items missing from Chelsea, specifically a milkshake machine, pasta machine, and ramekins. (*Id.* ¶ 51.)

Plaintiffs allege that defendants used their personal influence within the New York City Police Department to have Lawson arrested. (*Id.* 12.) Paloubis stated in deposition that he met with Ruland only once to sign the criminal complaint filed against Lawson and that he did not follow up on the complaint. (Paloubis Dep. at 40, 54.) Hatzigeorgiou testified in deposition that he was not personally involved in the criminal complaint and ensuing investigation of Lawson. (Hatzigeorgiou Dep. at 54–58.)

On January 9, 2001, Lawson went to the 13th Precinct where he claims he was questioned by the police, handcuffed, fingerprinted, photographed, and made to wait in a holding cell for several hours. (*Id.* ¶¶ 55–73.) Lawson was charged with one count of petit larceny pursuant to New York Penal Law 155.25. (Exume Aff. Ex.

J.) Lawson's criminal court file indicates that the charges were dismissed upon the motion of the District Attorney. (Crisci Affirm. Ex. J.) A transcript of the proceedings reports that the Assistant District Attorney stated to the court, "[t]he People move to dismiss the case. We cannot prove it beyond a reasonable doubt." (Letter from Nancy Exume of June 10, 2004.)

Following his dismissal, Lawson applied to the New York State Department of Labor for unemployment benefits. After receiving benefits for a period of time, his application was denied based on a challenge brought by defendants. The denial was overturned at a hearing, which was upheld on appeal. (Lawson Aff. ¶¶ 100–118.)

Lawson alleges that he has suffered a great deal of physical and emotional distress as a result of his termination and arrest, including depression and an uncontrollable trembling condition. (Lawson Aff. ¶¶ 87–99, 119–150.) Melissa Lawson claims that as a result of defendants' actions, she has experienced a loss of consortium. (Melissa Lawson Dep. at 8–9.) Defendants have now made a motion for summary judgment to dismiss plaintiffs' complaint in its entirety.

## DISCUSSION

### I. Legal Standard

Federal Rule of Civil Procedure 56(c) allows a court to award summary judgment to the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When evaluating a motion for summary judgment, "the courts must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 87 (2d Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

The party opposing summary judgement "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998), but instead "must set forth specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e). However, "[s]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for a nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

### II. Breach of Employment Contract and Wrongful Discharge

In New York, "where the term of employment is for an indefinite period of time, it is presumed to be a hiring at will that may be freely terminated by either party at any time for any reason or even for no reason." *Lobosco v. N.Y. Tel. Co.*, 96 N.Y.2d 312, 316, 727 N.Y.S.2d 383, 751 N.E.2d 462 (2001) (citing *Martin v. N.Y. Life Ins. Co.*, 148 N.Y. 117, 121, 42 N.E. 416 (1895)). New York does not recognize a cause of action for wrongful discharge. *Id.* (citing *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 297, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) (no cause of action for abusive discharge where plaintiff was discharged for reporting accounting improprieties of employer)); *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987) (no

implied-in-law obligation requiring employer to deal fairly and in good faith where employee's alleged dismissal was based on his whistle-blowing). "[A]bsent a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment, an employer's right at any time to terminate an employment at will remains unimpaired." *Murphy*, 58 N.Y.2d at 305, 461 N.Y.S.2d 232, 448 N.E.2d at 91.

Plaintiffs rely on *Weiner v. McGraw–Hill, Inc.*, 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982), which created an exception to the general employment-at-will presumption where an employer makes an employee aware of an express written policy limiting its right to terminate the employee who detrimentally relies on that policy when accepting the employment. Plaintiffs also cite *Wieder v. Skala*, 80 N.Y.2d 628, 635, 593 N.Y.S.2d 752, 609 N.E.2d 105 (1992), in which the New York Court of Appeals held that the "distinctive relationship between a law firm and a lawyer hired as an associate" creates an "implied-in-law obligation" to continue employing the plaintiff absent good cause for termination.

Plaintiffs do not dispute that Lawson was an at-will employee when he was hired in May 2000. Nor do they dispute that Lawson did not sign an employment contract, manual, or handbook at the time of his hiring. Plaintiffs instead assert that the termination clause in the employee manual provided to Lawson in June 2000 falls within the *Weiner* exception. According to plaintiffs, when Lawson received and signed the manual with its termination clause, his employment contract was modified and defendants entered into a binding agreement to continue employing Lawson.

■ Plaintiffs, however, present no evidence that Lawson relied on the termination clause in the Chelsea manual to his detriment, an essential element in the

*Weiner* analysis. *See Weiner*, 57 N.Y.2d at 458, 457 N.Y.S.2d 193, 443 N.E.2d at 441 (plaintiff rejected other offers of employment and left former employer in reliance on the assurance that he would not be terminated without just cause). In their statement of material facts in dispute, plaintiffs claim that Lawson spoke to a recruiter during his tenure at Chelsea but chose not to pursue the employment opportunities presented by him because of the termination clause in the employee manual. (Pl. Local Rule 56.1 Statement ¶ 8.) Lawson's affidavit, however, states that he spoke with the recruiter and decided not to pursue any job opportunities because defendants assured the recruiter that they would "do right by" Lawson. (Lawson Aff. ¶¶ 16–21.) This discrepancy aside, plaintiffs fail to provide any specific details on actual job opportunities that Lawson passed up in reliance on the termination clause in the employee manual, and thus cannot prove the elements of the *Weiner* exception. *See De Petris v. Union Settlement Ass'n, Inc.*, 86 N.Y.2d 406, 633 N.Y.S.2d 274, 657 N.E.2d 269 (1995) ("Mere existence of a written policy, without the additional elements identified in *Weiner*, does not limit an employer's right to discharge an at-will employee or give rise to a legally enforceable claim by the employee against the employer").

Nevertheless, plaintiffs argue that Lawson's continued employment at Chelsea was sufficient to create a binding obligation on defendants. The only case cited by defendants for this proposition is *Cook v. Heck's, Inc.*, 176 W.Va. 368, 342 S.E.2d 453 (W.Va.1986). There, the Supreme Court of Appeals of West Virginia held that where an employee was provided an employee handbook subsequent to her hiring, a unilateral contract was created and the employee's continuing work constituted an acceptance sufficient to make the employer's promise binding and enforce-

able. *Id.* There is absolutely no indication that New York courts are willing to extend the narrow exceptions created in *Weiner* and *Wieder* to cases in which an employee did not detrimentally rely on the employee manual.[2] Regarding the narrow exceptions to the employment-at-will doctrine, the New York Court of Appeals held:

> The only exceptions to the employment-at-will rule ever adopted by this Court have involved very specific substitutes for a written employment contract: in *Weiner*, the employer's express, unilateral promise on which the employee relied; in *Wieder*, the parties' mutual undertaking to practice law in compliance with DR 1–103(a), a rule so fundamental and essential to the parties' shared professional enterprise that its implication as a term in their employment agreement aided and furthered the agreement's central purpose. We have consistently declined to create a common-law tort of wrongful or abusive discharge, or to recognize a covenant of good faith and fair dealing to imply terms grounded in a conception of public policy into employment contracts ... and we again decline to do so.

*Horn v. N.Y. Times*, 100 N.Y.2d 85, 96, 760 N.Y.S.2d 378, 790 N.E.2d 753 (2003).

Plaintiffs further urge the Court to follow other jurisdictions in creating a cause of action where an employee has been discharged for disclosing illegal activities on the part of his employer. (*See* Pl. Mem. at 18.) The New York Court of Appeals explicitly declined to adopt such a cause of action, instead deciding that "such a significant change in our law is best left to the Legislature." *Murphy*, 58 N.Y.2d at 301, 461 N.Y.S.2d 232, 448 N.E.2d at 89. Following the advice of that court that "[r]outinely issued employee manuals ... should not lightly be converted into binding employment agreements," this Court concludes that the Chelsea employee manual did not create a binding and enforceable promise. *Lobosco*, 96 N.Y.2d at 317, 751 N.E.2d at 466. Defendants' motion for summary judgment is granted and this cause of action dismissed.

## III. Malicious Prosecution

■ A cause of action for malicious prosecution in New York has four elements: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir.1995).

### A. Initiation

■ To prove that a defendant initiated a criminal proceeding for purposes of a malicious prosecution action, "[t]he mere reporting of a crime to police and giving testimony are insufficient; it must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the au-

---

**2.** Plaintiffs cite several cases in the Second Circuit in which federal courts were "less hesitant to find occasion to construe New York employment doctrine more broadly in favor of plaintiffs seeking relief from allegedly wrongful termination." *Wolde–Meskel v. Tremont Commonwealth Council*, 1994 WL 167977, at *3 (S.D.N.Y. April 29, 1994); *see also Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847 (2d Cir.1985). In *Baron v. Port Auth. of N.Y. and N.J.*, 271 F.3d 81 (2d Cir.2001), the Second Circuit held that disclaiming language in an employee manual preserved the employee's at-will status. Regarding the divergence between New York and federal courts on the at-will employment doctrine issue, the court wrote: "[i]n light of the clarity with which the New York Court of Appeals spoke in *Lobosco*, we believe the burden is now on the federal courts of this circuit to eliminate the divergence." *Id.* at 87 n. 4.

thorities to act." *DeFilippo v. County of Nassau*, 183 A.D.2d 695, 696, 583 N.Y.S.2d 283 (2d Dep't 1992). "[A] civilian may be liable for malicious prosecution where the plaintiff shows that the civilian 'initiated or instigated the proceedings against [her] by contacting the police and then encouraging their prosecution.'" *Arum v. Miller*, 273 F.Supp.2d 229, 234 (E.D.N.Y.2003) (quoting *Shattuck v. Town of Stratford*, 233 F.Supp.2d 301, 314 (D.Conn.2002); *White v. Frank*, 855 F.2d 956 (2d Cir.1988) (in § 1983 malicious prosecution action, noting that the complaining witness may be held liable for her role "in initiating a baseless prosecution" and was not "absolutely immune at common law")).

Here, it is undisputed that defendants contacted police and signed a criminal complaint against Lawson alleging petit larceny. Lawson alleges that throughout the course of his employment at Chelsea, defendants threatened to report him to police a number of times. Lawson stated in his deposition that Hatzigeorgiou told Lawson that he could have Lawson arrested by calling a "cop friend." (Lawson Dep. at 270.) Moreover, after Lawson was terminated, his wife alleges that she received a phone call from Hatzigeorgiou who stated that he would have Lawson arrested for photographing the menu, and that everyone would believe Hatzigeorgiou's accusations because Lawson is "young and black." (Pl. Local Rule 56.1 Statement ¶ 9.)

Defendants assert that none of these incidents took place and that defendants merely provided the police with information and signed the criminal complaint against Lawson. Nevertheless, there are sufficient questions of fact in dispute about the defendants' actions in initiating this prosecution to deny summary judgment on this issue. *See Arum*, 273 F.Supp.2d at 234 (where defendant called the police and filled out a complaint,

court finds that there are genuine issues of material fact whether defendant initiated or instigated the criminal proceeding); *cf. Brown v. Sears Roebuck & Co.*, 297 A.D.2d 205, 210, 746 N.Y.S.2d 141 (1st Dep't 2002) (granting summary judgment for defendant where he provided information to police and signed complaint but where no evidence exists that the police officer's determination to arrest plaintiff rested on defendant's statements).

## B. Favorable Termination

In New York, a malicious prosecution plaintiff's burden "is to demonstrate a final termination that is not inconsistent with innocence." *Rothstein v. Carriere*, 373 F.3d 275, 286 (2nd Cir. Jun 24, 2004). In *Smith–Hunter v. Harvey*, 95 N.Y.2d 191, 199, 712 N.Y.S.2d 438, 734 N.E.2d 750 (2000), the New York Court of Appeals held that a dismissal on speedy trial grounds was favorable termination for purposes of a malicious prosecution claim and stated that:

> We reject the notion—as contrary to the common law and our longstanding precedents—that, under the particular circumstances here, plaintiff must demonstrate innocence in order to satisfy the favorable termination prong of the malicious prosecution action.
>
> . . . [D]ispositions inconsistent with innocence . . . cannot be viewed as favorable to the accused.

*See also Cantalino v. Danner*, 96 N.Y.2d 391, 396, 729 N.Y.S.2d 405, 754 N.E.2d 164 (2001) ("the question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused"). Therefore, as a general rule, "a final termination of a criminal proceeding in favor of the accused is a favorable termination for the purposes of a subsequent malicious prosecution claim." *Rothstein*, 373 F.3d at 286. This general rule is

subject to exceptions, such as where the dismissal was the result of misconduct of the accused, out of mercy, or if the charge is withdrawn or the prosecution abandoned pursuant to a compromise with the accused. *Id.* at 286–87 (citing *Smith–Hunter*, 95 N.Y.2d at 195–197, 712 N.Y.S.2d 438, 734 N.E.2d 750).

 None of these exceptions applies here, where the Assistant District Attorney stated to the trial court that "[t]he People move to dismiss the case. We cannot prove it beyond a reasonable doubt." (Letter from Nancy Exume of June 10, 2004.) In its motion for summary judgment, the defendants have provided no evidence that would tend to show that the dismissal was based on Lawson's misconduct, mercy for him, or was pursuant to a compromise. A "formal abandonment of the proceedings by the public prosecutor" constitutes favorable termination. *Smith–Hunter*, 95 N.Y.2d at 198, 712 N.Y.S.2d 438, 734 N.E.2d 750; Restatement [Second] of Torts § 659(c). Although entry of a *nolle prosequi* is the usual method for indicating a formal abandonment of the prosecution, a formal abandonment is also indicated, "for example, by a motion to dismiss the complaint." Restatement [Second] of Torts § 659(c), cmt. *e*. Here, the termination was in Lawson's favor and was not inconsistent with his innocence. *See Bordeau v. Vill. of Deposit*, 113 F. Supp.2d 292, 298–99 (N.D.N.Y.2000) (although DA stated that there was no indication that plaintiffs were not guilty, "there is nothing in the dismissal that could be construed as inconsistent with plaintiffs' innocence"). Plaintiffs have sufficiently proven favorable termination to survive defendants' motion for summary judgment on this issue.

C. Probable Cause

 "In the context of a malicious prosecution claim, probable cause under New York law is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *DiBlasio v. City of New York*, 102 F.3d 654, 659 (2d Cir.1996). Stated another way, the question is whether "a discreet and prudent person would be led to the belief that a crime had been committed by the person charged." *Loeb v. Teitelbaum*, 77 A.D.2d 92, 103, 432 N.Y.S.2d 487 (2d Dep't 1980) (quotation omitted). Courts have held that where, as here, there are factual disputes regarding probable cause to initiate a criminal proceeding, summary judgment must be denied:

> [T]he issue of probable cause is a question of law to be decided by the court only where there is no real dispute as to the facts or to the proper inferences to be drawn from such facts.... Where there is "conflicting evidence, from which reasonable persons might draw different inferences ... the question [is] for the jury."

*Kurschus v. PaineWebber, Inc.*, 16 F.Supp.2d 386, 394 (S.D.N.Y.1998) (quoting *Parkin v. Cornell Univ.*, 78 N.Y.2d 523, 529, 577 N.Y.S.2d 227, 583 N.E.2d 939 (1991)) (where facts on the issue consist mainly of conflicting testimony of parties, court cannot conclude in summary judgment that civilian complainant had probable cause to arrest plaintiff).

In New York, a person may be found guilty of Petit Larceny, a class A misdemeanor, "when he steals property." N.Y. Penal Law § 155.25. Here, Paloubis stated that the only item he personally saw Lawson leave with was the knife sharpener. He admitted to having no personal knowledge of the existence or absence of the milkshake machine or the pasta machine, both of which he alleged Lawson stole in the criminal complaint. When Paloubis asked Lawson about the knife sharpener

he was taking from Chelsea, Lawson replied that it was his own. According to Lawson, it is common practice for chefs to bring their own knife sharpeners to the kitchens in which they work. Hatzigeorgiou stated in deposition that a member of the Chelsea kitchen staff informed him that items were missing from the kitchen but he could not recall specifically which Chelsea employee. Viewing all facts in the light most favorable to plaintiffs, there are genuine material facts in dispute regarding whether defendants had knowledge or reasonably trustworthy information to believe that Lawson had committed the crime of petit larceny. As such, summary judgment must be denied on this issue.

### D. Malice

Under New York law, malice does not have to be actual spite or hatred, but means only "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir.1996). A lack of probable cause "tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause." *Id.* (quoting *Conkey v. State*, 74 A.D.2d 998, 999, 427 N.Y.S.2d 330 (4th Dep't 1980), *appeal denied*, 50 N.Y.2d 803, 431 N.Y.S.2d 1026, 410 N.E.2d 752 (1980)). "New York courts recognize that actual malice can rarely be established through direct evidence and thus may be proven though circumstantial evidence." *Rounseville v. Zahl*, 13 F.3d 625, 630–631 (2d Cir.1994) (citing *Martin v. City of Albany*, 42 N.Y.2d 13, 17, 396 N.Y.S.2d 612, 364 N.E.2d 1304 (1977)).

Defendants argue that the record does not support a finding of malice because they did not continue to pursue the criminal charges against Lawson after their initial complaint. This assertion is beside the point. As there are disputed questions of fact going to probable cause, there are also questions of fact about whether defendants believed Lawson was guilty of larceny when they made their accusations. Moreover, Lawson and his wife have alleged that defendants threatened to have Lawson arrested on a number of occasions for reporting defendants' actions to the IRS and stated that they would be believed because Lawson is "young and black." Viewing these disputes in the light most favorable to plaintiffs, it would not be unreasonable for a fact-finder to determine that defendant acted with an improper motive in reporting Lawson to police. Because there are a number of questions of disputed material fact on the malicious prosecution claim, defendants' motion for summary judgment is denied.

### IV. Intentional Infliction of Emotional Distress

Under New York law, a claim for intentional infliction of emotional distress requires a showing of "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir.1999); *see also Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Howell* at 122, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (*quoting Murphy*, 58 N.Y.2d at 303, 461 N.Y.S.2d 232, 448 N.E.2d 86); Restatement (Second) of Torts, § 46 cmt. *d* (1965).

"New York courts appear to require that plaintiffs allege either an unrelenting campaign of day in, day out harassment or that the harassment was accompanied by physical threats, in order to state a cognizable claim for intentional infliction of emotional distress." *Nunez v. A–T Fin. Info., Inc.*, 957 F.Supp. 438, 442 (S.D.N.Y. 1997); *see also O'Reilly v. Executone of Albany, Inc.*, 121 A.D.2d 772, 773, 503 N.Y.S.2d 185 (3d Dep't 1986); *Persaud v. S. Axelrod Co.*, 1996 WL 11197, at *4 (S.D.N.Y. Jan.10, 1996). In addition, New York courts have made clear that the "use of religious, ethnic or racial aspersions to denigrate a person ... is not sufficiently egregious conduct to sustain a claim" of intentional infliction of emotional distress. *Graham v. Guilderland Cent. Sch. Dist.*, 256 A.D.2d 863, 864, 681 N.Y.S.2d 831 (3d Dep't 1998), *appeal denied*, 93 N.Y.2d 803, 689 N.Y.S.2d 16, 711 N.E.2d 201 (1999); *see also Leibowitz v. Bank Leumi Trust Co. of N.Y.*, 152 A.D.2d 169, 548 N.Y.S.2d 513 (2d Dep't 1989).

New York courts have dismissed cases involving acts of harassment related to employment decisions on the ground that such conduct was not extreme and outrageous. For example, in *Murphy*, 58 N.Y.2d at 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, the plaintiff alleged that he was transferred and demoted for reporting fraud, coerced to leave by being told that he would never be allowed to advance, discharged and ordered to leave immediately after reporting other alleged in-house illegal conduct, and then forcibly and publicly escorted from the building by guards when he returned the next day to pick up his belongings. The Court of Appeals held that this conduct fell "far short" of the tort's "strict standard" for outrageous behavior. *Id.* at 303, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86.

■ According to plaintiffs, the defendants conspired to have Lawson arrested, made racist remarks about him to his wife, and threatened him. (Pl. Mem. at 24.) Plaintiffs allege that Lawson has suffered severe anxiety as a result of defendants' actions. (*Id.* at 25.) Plaintiffs claim that the defendants knew that their actions would have such an effect because Lawson is a religious man who would be distressed by a claim that he had committed larceny and was arrested. (*Id.* at 24.) Defendants' alleged conduct may have been unprofessional and upsetting, however, this is not a case "where severe mental pain or anguish [was] inflicted through a deliberate and malicious campaign of harassment or intimidation." *See Nader v. Gen. Motors Corp.*, 25 N.Y.2d 560, 569, 307 N.Y.S.2d 647, 255 N.E.2d 765 (1970). Plaintiffs have failed to allege any conduct that is sufficiently "extreme and outrageous" to meet the stringent New York standard. Accordingly, Defendants' motion for summary judgment on this claim should be granted; plaintiffs' intentional infliction of emotional distress claim is dismissed.

## V. Slander and Libel

■ Plaintiffs' complaint appears to allege causes of action for slander and libel based on defendants' oral and written statements to the Department of Labor in connection with Lawson's unemployment benefits hearing. (Compl.¶¶ 36–46.) Plaintiffs neglected to brief this issue or to include any supporting facts in their Local Rule 56.1 Statement. To the extent that plaintiffs' complaint alleges the torts of slander and libel, these must be dismissed because statements to the Department of Labor, whether oral or written, are absolutely privileged under New York law. *Allen v. St. Cabrini Nursing Home*, 2001 WL 286788, at *6 (S.D.N.Y. March 9, 2001), *aff'd*, 2003 WL 21369263 (2d Cir. June 13, 2003), *cert. denied*, — U.S. —, 124 S.Ct. 1158, 157 L.Ed.2d 1051 (2004) ("[w]hen an employer writes to the De-

partment of Labor concerning a former employee's right to unemployment benefits, that writing is subject to an absolute privilege and cannot serve as the basis for a libel action brought by the claimant employee"). Defendants' motion for summary judgment on the slander and libel claims is granted and these causes of action dismissed.

### CONCLUSION

For the reasons above, defendants' motion for summary judgment is denied on the claim of malicious prosecution. Defendants' motion for summary judgment is granted on all other claims in the complaint.

SO ORDERED.